Moncure, J.
The first question which, in natural order, comes up for consideration in this case is, Whether the order of the County court of Mecklenburg, granting to George W. Avory administration on the estate of William T. Avory, was a void order, for want of jurisdiction in the court to make it?
It is now well settled, that the County court is a court of general jurisdiction in regard to probates and the grant of administrations; that it has jurisdiction in regard to the whole subject matter; and that though it may err in taking jurisdiction of a particular case, yet the order is generally not void, but only voidable on citation or appeal, and cannot be questioned in any collateral proceeding. Fisher v. Bassett, 9 Leigh 119; Burnley v. Duke, 2 Rob. R. 102; Schultz v. Schultz, 10 Gratt. 358; Cox, &c., v. Thomas' adm'x, 11 Id. 323; Hutcheson v. Friddy, 12 Id. 85. I say the order is generally not void ; for there are one or two exceptions to the rule, if exceptions they can be called. As where the supposed testator or intestate is alive; or where, if dead, he has already a personal representative in being when the order is made, granting administration on his estate. If he be then alive, the order is of course void. And so also if he has already a personal representative, who stands in his place and is invested with all his rights of personal property in the state. Griffith v. Frazier, S Cranch’s R. 9. There must be an office, and that office must be vacant, in *237 order to a valid appointment of a personal representative. Until then there is in fact no “ subject matter,” to be within the jurisdiction of the court. That subject matter is, the appointment of a personal representative to a decedent who has none, and whose personal estate is therefore without an owner. The validity of an order making an appointment, must depend on the existence of that state of things. And though the court must enquire into these preliminary facts, and in some sense adjudge them, in every case in which it makes an appointment; yet the judgment, to that extent, is incidental and inconclusive. If in fact there be a decedent without a personal representative, an order of a court of general jurisdiction on that subject, appointing one, is as conclusive on the question of jurisdiction of the particular case, as on any other question arising in the case.
I do not understand the counsel of the appellant as denying the correctness of these principles in their application to a case in which some court in the state has jurisdiction, though not the court making the appointment. But I understand them as contending that they are not applicable to a case in which no court in the state has jurisdiction ; and that this is such a case. They say the intestate resided and died in North Carolina, leaving no estate in Virginia, and therefore no court in Virginia had power to appoint an administrator. Suppose it to be true, that he did reside and die in North Carolina, leaving no estate in Virginia: would it follow that no court in Virginia had power to make the appointment? Had not the G-eneral court power to grant administration in such a case ? As the law stood when the order in question was made, the General court had power to grant administration on the estate of any decedent who had not a personal representative in the state; no matter where he resided or died, or whether he left any estate in the common *238 wealth or not. 1 Rev. Code 1519, p. 377, § 12, 382, § 32. Therefore, as some court in the state had power to make the appointment, it would follow, if that were the test, that the order of the County court of Mecklenburg is not void.
But I consider these principles as applicable to every case of a decedent who is without a personal representative in the state; without regard to the question, whether any court in the state has jurisdiction of the particular case or not. The subject matter being within the jurisdiction of the court, to wit: the appointment of a personal representative to a decedent who is without one; the court making the appointment will be considered as having adjudged the question of jurisdiction in the particular case; and the order will not be void. Whether the court had jurisdiction in the particular case or not, may depend upon a variety of facts: as, whether the decedent resided in the county whose court made the order; or had land there; or died there; or had estate of any kind there. If, after passing upon these facts, and taking cognizance of the case, the order of the court could at any after period, in any collateral proceeding, be avoided by evidence that the decedent did not reside, or die, or leave estate in the commonwealth ; all the inconvenience and other evils would be produced which are referred to in Fisher v. Bassett, and other cases before cited, and which are designed to be prevented by the principles laid down in those cases. In this case, the order was made in March 1840, the suit was brought in May 1847, no issue was raised by the pleadings in regard to the validity of the order, and the only evidence relied on to invalidate it is, that of a witness whose testimony was taken in 1849, and who states that the decedent lived and died in the county of Granville in the state of North Carolina, and that all his property was in that county. How *239 could he know that all the decedent’s property was there ? that he had not a particle of property, nor a dollar due to him any where in Virginia? How could any body be expected to know, or be able to prove at that remote period, what were the facts on which the County court of Mecklenburg took jurisdiction of the case? Can the judgment of a court of general jurisdiction over the subject matter be overthrown by testimony like this, taken nine years after the judgment, and in a collateral proceeding?
While great evils would result from holding an order appointing an administrator of a decedent who lived and died out of the state and owned no property therein to be void ; none whatever would result from holding the contrary. There can be no evil in appointing an administrator of a decedent who has no property. Indeed, nothing is more common; and it is often convenient if not necessary to do so, to carry on a suit to which he may be a proper party.. That the decedent lived and died out of the state, makes no difference. If a non-resident owning no property happen to die here, the court of the county in which he dies is expressly authorized to appoint an administrator.
I therefore think the order in question was not a void order.
The next question to be considered is, Whether the sureties of the administrator are responsible for assets of the intestate which were situated at his death in the county of Granville in North Carolina, but after his death were brought to the county of Mecklenburg in Virginia, and there treated and held as assets by the administrator.
It is now well settled that a grant of administration has no legal operation out of the state from whose jurisdiction it was derived; and that an executor or administrator appointed in one state, is not, in virtue of such appointment, entitled to sue, nor is he liable *240 to be sued, in his official capacity, in any other state or country. Story on Confl. Laws, § 514. There are some apparent exceptions to this rule, though they are not really so. In equity, an executor or administrator is sometimes liable to be sued in another state or country, under the peculiar circumstances of the case; as in Powell v. Stratton, 11 Gratt. 792; and sometimes to avoid a failure of justice; as in Tunstall v. Pollard's adm'r, 11 Leigh 1, and other cases cited in 1 Rob. Pr. (new) p. 178 and 192. In these cases it cannot be said that the suit is against him in his official capacity, but on the ground of a personal trust, which makes him liable, under certain circumstances, to account in a court of equity, where he may be found, to those entitled to the estate, wherever it may be situate. Governor v. Williams, 3 Ired. R. 152. So also, if an executor or administrator reduce property of his testator or intestate into possession, he may afterwards sue for it in another state, even at law; but the suit must be brought in his own name, and not in his official capacity. He is, to all intents and purposes, the legal owner of the property, though for the benefit of other persons. Story’s Confl. Laws, § 516; 1 Lomax on Ex’ors, 341, marg.
In order, therefore, to reduce the assets into possession, and close the administration and distribution of a decedent’s estate, it is generally necessary that there should be a personal representative in every state in which the assets may be situate. They are subject to the payment of debts according to the law of the situs, but to distribution according to the law of the domicil. It is therefore a matter of convenience that the surplus of the assets remaining in the hands of a local administrator after the payment of debts, should be sent home, that is, to the domiciliary administrator, for distribution. And this seems to be the course generally pursued; though the distribution may be made *241 by the local administrator. Whether the one course or the other will be pursued in any particular case, depends upon the local law and the judicial discretion of the local court. If the surplus be paid over to the domiciliary administrator, it is matter of national comity and not of right. Every state is bound, to the extent of its power, to take care of the rights of its own citizens. And therefore it will see that the estate of a decedent within its jurisdiction is properly applied to the satisfaction of their rightful claims, whether as creditors, legatees or distributees of the decedent. But those claims being satisfied, it has no longer any motive to retain the fund, and will not, unless it be more convenient to dispose of the subject fully and finally, than to send it home for that purpose. If none of the citizens of the state have any claim upon the fund, either as creditors, legatees or distributees, and the aid of its courts be not invoked by a foreign claimant, it will have no motive to interfere with the fund, or prevent the domiciliary administrator from obtaining possession of it if he can. Of course he cannot sue for it, and if he cannot obtain possession otherwise, he or some person else must become local administrator. Me will be preferred to any person else, as he will have the ultimate receipt and distribution of the fund.
But it very often happens, and especially in the United States, where there are so many states adjacent to each other, separated only by an imaginary line, and where there is so much commercial and social intercourse between the citizens of different states, and such frequent changes of residence from one state to another, that an administrator in one state receives property or money belonging to his intestate in another, without any administration being taken there, and holds it in his own state as assets of his intestate. And it sometimes, if not very often, happens that pro *242 perty of a decedent is carried, or one of his debtors removes, from a state in which there is no administrator, to another in which there is one, and the property or debt is received and held as assets by the administrator there. Can it be contended that the sureties of the administrator are not liable for property or money so received and held by him as assets? Does it lie in their mouths any more than in his, to deny that they are what he, by his act has affirmed them to be ? Is it enough for them to say that their principal could not have recovered the property or money, if the person having possession had refused to deliver or pay to him ? that such person may be liable to deliver or pay it over again to a local administrator, if one should be hereafter appointed? that the grant of administration, and the condition of the administration bond are confined to property which actually belonged to the decedent, and was situated at the time of his death within the limits of the jurisdiction which made the grant? I think not. The terms of the administration bond expressly apply to all the goods, chattels and credits of the decedent which shall come to the hands .of the administrator. We have seen that a domiciliary administrator generally receives any surplus remaining in the hands of a local administrator on the settlement of the account of the latter. And if the same person be, as he often is, both domiciliary and ancillary administrator, while he is first accountable in either character according as he receives assets in one or the other, it is his duty to pass over the surplus remaining in his hands as ancillary, to his hands as domiciliary administrator. Are not his sureties as domiciliary administrator liable for the surplus so received or passed over? In Adams’ heirs v. Adams' administrator, 11 B. Monr. 77, the sureties of a person as ancillary administrator were discharged from liability for assets received in that character, on the ground that he should be regarded as ■ *243 holding them as domiciliary administrator. If they were properly discharged, his sureties as domiciliary administrator were of course chargeable. See 1 Eob. Pr. (new) 189, <§ 4, and cases cited. There is no difference between the form of the grant and bond in the case of a domiciliary, and in the case of an ancillary administration. And if the former may operate upon assets received and held by the administrator as such within the state, though situated abroad at the decedent’s death, why may not the latter? In the case before stated, of property of a decedent being carried, or one of bis debtors removing, from a state in which there is no administrator, to another, in which there is one, I do not see how the estate of the decedent could ever get the benefit of the property or money, unless it could be recovered by the administrator in the state to which it is removed, because there is no other administrator; and if one should be appointed, he could not, as we have seen, sue as such in another state. I know of no exception to that rule. It is true that the title of an administrator relates back to the death of bis intestate, so as to enable him to sue for causes of action arising between that period and the date of his appointment. But he must in such a case, I think, .sue in his capacity of administrator, and notin his own right. When he has once acquired actual possession of the property, he has then a legal title to it, which he can thereafter assert in his own name. Story’s Oonfl. Laws, % 516. He must of course sue in his capacity of administrator for causes of action accruing in the lifetime of his intestate.
It would hardly be contended that where, in an ordinary case, an administrator as such sues for, recovers and receives, or demands and receives without suit, property or money, and holds it as assets of his intestate, the sureties of the administrator could exonerate ¿themselves from liability therefor, merely by showing *244 that it did not in fact belong' to the intestate. A fortiori, it would seem they could not, merely by showing that though such property or money did in fact belong to the intestate, yet it ought to have been received by some other administrator in some other state, who may never have been appointed ; or, if appointed, may never have claimed it, or even been entitled to sue for and recoyer it. In Burnley v. Duke, 2 Rob. R. 102, it was held, that though an administrator de bonis non cannot recover of a former administrator assets converted by him (because they are not unadministered assets, and therefore not within the scope of the commission of the administrator de bonis non), yet if he actually receive them, he and his sureties are accountable therefor. In that case, if the sureties of the administrator de bonis non had not been responsible, the sureties of the original administrator would have been. The question was, which of two sets of sureties was responsible ? One or the other certainly was,, and in either aspect, those entitled to the estate had an ample and effective remedy. It would seem to be still more reasonable to hold the sureties of an administrator responsible for assets received by Mm as such, when those entitled to the estate would otherwise have no security whatever. The bond of an administratov de bonis non is expressly limited to the assets which are unadministered, while the bond of an original administrator is unlimited in its terms, and extends to all the assets which may come to the hands of the administrator. If the sureties of the former are liable for assets received by their principal, though derived from a subject not embraced by the limited terms of their bond, why are not the sureties of the latter liable for assets received by their principal, and therefore embraced by the general terms of their bond, though derived from a subject at one time situated out of the state ? I think that wherever an adminis *245 trator receives or holds within the state in which he was appointed, property or money as assets of his intestate, he and his sureties are accountable therefor as assets, unless it be clearly proved that such property or money belongs to some other person to whom the administrator, personally, has accounted, or will have to account for the same.
I have examined, I believe, all the cases referred to in the argument on this branch of the case, and I am not aware that there is one of them in conflict with the conclusion to which I have come; though there are dicta in some of them which may be so. Without undertaking to review them, I will notice only the case of Fletcher's adm'r v. Sanders, 7 Dana’s R. 345, which is perhaps the strongest case cited by the counsel of the appellant in support of their view. In that case it was held, that the surety of an executor to whom letters testamentary were granted in Kentucky (which however was not the place of the testator’s domicil at the time of his death), was not responsible for assets received in a foreign state and never brought to Kentucky. Upon the ground that they were never brought to Kentucky, the opinion of the court was expressly placed. And even in that opinion, one of the three judges who composed the court, did not concur. Most of the cases on this subject, and no doubt all that are material, are cited and commented upon in Story’s Confl. Laws, § 507-529; and in 1 Rob. Rr. (new) p. 159-194.
I have stated my opinion as to the principles of law which seem to be applicable to this case; and it now only remains, so far as this branch of it is concerned, to apply them to the facts of the case; which can be easily done. In 1840 William T. Avory died in Gran-ville county, North Carolina, intestate, unmarried and without issue, leaving a small personal estate in that county, and no estate, so far as the record shows, any *246 where else. He left seven distributees at law, who were his mother, brothers and sisters; all of whom (except perhaps one sister, who may have resided with her husband in North Carolina), seem to have resided in Mecklenburg county, Virginia, which adjoins Gran-ville county, North Carolina. His debts were very few in number and small in amount, and most of them were probably due in Virginia. He had lived in Granville county but a year before his death, and doubtless had removed to that county from Mecklenburg, Virginia, where the rest of the family resided. His brother, George W. Avory, who lived with his mother at the time of his death, and for several years thereafter, and was guardian of several of the distributees, who were infants, qualified as his administrator soon after his death, to wit, in March 1840, in the County court of Mecklenburg, giving the usual bond with surety in the penalty of four thousand dollars. He immediately took possession of the property in North Carolina, and held it, or its proceeds, in Virginia, as assets of his intestate. The perishable property was sold by him in May 1840, about two months after he qualified, on a credit of twelve months, the bonds being taken payable to himself as administrator. Whether the sale was in Virginia or North Carolina does not appear. The slaves were sold in Virginia in July 1840, under a decree of the County court of Mecklenburg, made in May 1840. He received a debt due to his intestate, but whether he received it in the one state or the other, does not appear. It does not appear that any person ever administered in North Cai’Olina, or had any interest in having administration granted there. It is extremely probable, from all the circumstances, that the contrary is the fact, and that it was deemed to be best by the parties concerned, to have but one administration, and to have that in Virginia, where all, or nearly all, the distributees and ere *247 ditors resided. Upon this state of facts I have no difficulty in coming to the conclusion that the sureties of the administrator became responsible for the assets so received and held by him in Virginia, though situate, at the death of his intestate, in North Carolina.
The next question to be considered is, Whether the sureties of the administrator have been discharged from that liability as to the slaves belonging to the estate of the intestate, by reason of the decree of the County court of Mecklenburg, made in May 3840, appointing George W. Avory commissioner to sell the said slaves, divide the proceeds among the distributees, and by reason of the sale made under that decree and the other circumstances of the case ?
I think this question must be answered in the affirmative. The slaves were not required for the payment of debts, and the administrator had therefore no right to sell them. He was willing at once to surrender them to the distributees for partition, and did in effect do so. He was himself a distributee, and was guardian of two others. The slaves could not be divided in kind, and a sale was therefore necessary for the purpose of division. But some of the distributees were infants, and a decree for a sale was therefore obtained. That decree was made in a suit to which George W. Avory and his two wards were defendants, and all the other distributees were plaintiffs. George W. Avory was not a party to the suit as administrator, thus showing that he had, in effect, surrendered the slaves to the distributees for partition. The bill alleges that he had paid all the debts of his intestate without a sale of any of the slaves, and prays for a decree for a sale of the slaves and division of the proceeds. The defendants answered the bill, admitting its allegations, and expressing their willingness that the court should decree according to the prayer thereof. And a decree was accordingly made. Shortly after *248 the decree, to wit, on the 1st of July 1840, the sale was made by George W. Avory as commissioner, at public auction, on a credit of twelve months, as prescribed by the decree; at which sale he purchased one of the slaves, and another distributee the other. No report of the sale was made, and no other order appears to have been made in the suit until May 1847, about the time of the institution of this suit, when, on the petition of the plaintiffs, the order of sale made seven years before was set aside. The record does not contain a copy of the petition, if it was in writing, nor show the grounds of it. Nor does it appear that the administrator or his sureties had any notice of the petition or motion to set aside the order of sale. The bill in this suit, which was filed by the same persons who were plaintiffs in the suit for the sale of the slaves, alleges that “ the slaves were sold by the administrator under a pretended order obtained by him from the County court of Mecklenburg, under some false pretext, without the knowledge or consent of the complainants, and which order was afterwards set aside by the said court.” The administrator, being a non-resident of the state, and it seems insolvent also, never answered the bill. The sureties in their answer rely upon the suit and decree for the sale of the slaves, and the proceedings under the decree, for their exoneration from any liability on account of the slaves. There is no proof in the record to sustain the vague allegation contained in the bill of fraud on the part of the administrator in obtaining the order of sale. It devolved on the plaintiffs to prove it. The sureties do not admit it in their answer, though they do not in terms deny it, doubtless because they had no information on the subject. But the circumstances of the case strongly tend to disprove the allegation. The sale was made at public auction, in the neighborhood of the distributees, one of whom (besides the commissioner *249 himself) was a purchaser at the sale, and none of whom complained of it until seven years after, when the commissioner had become insolvent and left the state. There is no such irregularity, if any, on the face of the proceedings as avoids the decree for the sale of the slaves. It must be regarded then as a valid decree at the time it was made; and the effect of it was, to take the slaves out of the hands of George W. Avory as administrator, and place them in his hands as commissioner of the court. The sureties of the administrator were thereby as completely discharged from liability as they would have been if the administrator and commissioner had been different persons, and the former had delivered the slaves to the latter under the decree. That liability being once discharged, was not revived by the order made seven years thereafter setting the decree aside; whether that order was regularly made, or was itself valid, or not; a question which it is therefore unnecessary to determine.
The only other question which it will be necessary to notice is as to the propriety of charging the administrator and his sureties with the amount of the bond of Henry W. Avory to the intestate for two hundred and fifty-four dollars and twenty-eight cents, due 1st March 1839. I concur in the opinion of the Circuit court upon that question, and for the reason expressed in the opinion, to wit, “ the payment of the same having been proved by one of the persons interested therein as distributee, and his deposition never having been taken in the cause, since the release of said interest, to prove said payment.”
The result of my opinion is, that the administrator is chargeable to the distributees in the sum of six hundred and sixty-seven dollars and eleven cents, with interest on four hundred and fifty-five dollars and thirty-six cents, part thereof, from September 1, 1848, being *250 the balance due on his administration account, without charging him with the proceeds of the sale of the slaves. The decree should therefore be reversed with costs, and a decree entered in conformity with this opinion.
%
Allen, P. and Lee and Samuels, Js. concurred in the opinion of Moncure, J.
Daniel, J. dissented.
Judgment reversed.